# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### ROCK ISLAND DIVISION

| | | |
|---|---|---|
| LYNN A. FIDLAR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 07-cv-4062 |
| | ) | |
| MICHAEL ASTRUE, Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

# O P I N I O N  &  O R D E R

Before the Court are Plaintiff's Motion for Summary Judgment, filed on April 25, 2008 (Doc. 9), and Defendant's Motion for Summary Affirmance, filed on July 9, 2008 (Doc. 11).  For the reasons stated below, Plaintiff's Motion for Summary Judgment is DENIED, and Defendant's Motion for Summary Affirmance is GRANTED.

## BACKGROUND

### Procedural History

Plaintiff Lynn Fidlar filed for disability insurance benefits on May 31, 2005, alleging disability since November 30, 2002.  (R. 12).  Her claim was denied initially and upon reconsideration.  (R. 17-20, 31-40).  Following a January 31, 2007 hearing, Administrative Law Judge (ALJ) E. James Gildea denied Plaintiff's claim.  (R. 16, 471-507).  On August 24, 2007, the Appeals Council denied review of the ALJ's decision, and, accordingly, the ALJ's decision became the Commissioner's final decision for purposes of 42 U.S.C. § 405(g).  See 20 C.F.R. §§ 404.955, 422.210.  (R.

1

4).  On October 5, 2007, Plaintiff filed a complaint seeking judicial review of the ALJ's decision in federal court.

## Medical History

Plaintiff claims that she has been disabled since November 30, 2002.  Prior to this alleged onset date, Plaintiff was diagnosed with a medial meniscus tear of the posterior horn and underwent an arthroscopy in July 1999 to correct the problem. (R. 183, 375).  Subsequently, in April 2000, after experiencing neck pain, Plaintiff underwent an MRI of the cervical spine, which revealed a "[m]inimal herniated disc of C5-C6 level causing mild anterior indentation of the thecal sac."  (R. 178).  Dr. Yang Rhee, who reviewed the MRI results, noted in a medical record that the finding was probably not clinically significant.  (R. 178).  X-rays taken of Plaintiff's lumboscaral spine and hips in June 2003 were normal, except for evidence of "mild rotatory scoliosis of the lumbar spine" and "[m]ild degenerative disc disease at T12-L1 level."  (R. 220, 224, 319).

In August 2003, after experiencing diffuse muscle aches, Plaintiff was tested for inflammatory arthritis and various other conditions.  The tests were negative.[1] (R. 220).  On August 8, 2003, Dr. Golden diagnosed Plaintiff with fibromyalgia and recommended increased sleep, detoxification, and enhanced nutrition.  (R. 220).  On September 8, 2003, Plaintiff visited Dr. Golden for a follow-up appointment regarding her fibromyalgia.  Plaintiff was not feeling or sleeping well as of that

---

[1] Dr. Golden, Plaintiff's treating physician, indicated in medical records that Plaintiff suffered from joint pain, although he noted that the range of motion of her joints was normal.  In addition, the doctor noted that Plaintiff's left leg was shorter than her right leg by about a half inch, and he recommended a heel lift.  (R. 220).

date, and medical records indicate that Dr. Golden wrote her a prescription for Tramadol – a pain medication. (R. 219). During the September 2003 visit, Dr. Golden recommended another follow-up visit in one month; but it appears that Plaintiff did not attend a follow-up appointment regarding her fibromyalgia until October 2004 . (R. 214-18). The record reflects that Plaintiff's Tramadol prescription was refilled in the period between these follow-up visits. (R. 215, 217).

On October 4, 2004, Dr. Golden re-diagnosed Plaintiff with fibromyalgia after observing "trigger points in the back." (R. 214). Plaintiff stated to Dr. Golden, at that time, that she "pushes through the pain. She doesn't rest." (R. 214). Dr. Golden noted that Plaintiff was taking 50 mg of Tramadol five or six times per day. Dr. Golden again recommended dietary and detoxification-based treatments. In November 2004, Plaintiff saw a dietician for treatment of her fibromyalgia (R. 222).[2] She attended another follow-up appointment with Dr. Golden in 2006, during which she reported ongoing muscle aches and fatigue. (R. 441).

Earlier in 2004, Plaintiff had sought medical treatment for pain in her right shoulder and in both knees. (R. 356). With regard to her shoulder, Plaintiff told her doctor that she had particular trouble with reaching over her head or behind her back. (R. 354). A March 9, 2004 MRI on Plaintiff's right shoulder revealed a "loose body" in the right shoulder joint, although Plaintiff's doctor indicated that this defect was not causing the symptoms about which Plaintiff complained. (R. 354,

_____

[2] In December 2004, Plaintiff underwent a hysterectomy, pelvic prolapse repair, and a surgical correction related to urinary incontinence. (R. 191). Medical records indicate that the surgeries went smoothly and that Plaintiff healed well. (R. 186, 196).

358).  Dr. Edward Connolly opined that Plaintiff was experiencing "tendinosis of the supraspinatus tendon."  (R. 354).  Physical evaluations performed in March through May of 2004 revealed some loss of range of motion in Plaintiff's right shoulder and, also, pain in connection with abduction and external rotation of the right shoulder.  (R. 352-56).  The same evaluations, however, convinced Dr. Connolly that Plaintiff was "neurovascularly intact."  (R. 352-54).  Dr. Connolly gave Plaintiff a few Depo-Medrol injections for her right shoulder pain during the period of March to May of 2004.  (R. 352-54).  Plaintiff tolerated the injections well.

Around the same time period, a medical evaluation performed on Plaintiff's knees revealed "significant crepitus" in her left knee.  (R. 355).  An x-ray of her left knee showed "significant arthritic changes," and Plaintiff was diagnosed with degenerative arthritis of the left knee.  (R. 354-55).  Medical records indicate no significant problems with Plaintiff's right knee.  (R. 350, 355).  She received a Depo-Medrol injection for her left knee pain in April 2005.  (R. 351).

Plaintiff's knee pain grew, and, in June 2005, she opted for a total left knee arthroplasty.  (R. 350).  The surgery was performed on September 13, 2005.  (R. 348).  Plaintiff experienced limited range of motion in her left knee immediately following the surgery, but she was able to ambulate without an assistive device.  (R. 348-49).  In October 2005, Plaintiff indicated to a physical therapist that she was able to perform all her daily activities, and Plaintiff also indicated to Dr. Connelly that she was much improved.  (R. 348-49).  By December 2005, Plaintiff had regained normal range of motion in her left knee and was not experiencing any significant pain in the knee.  (R. 346).  As a result, Dr. Connolly indicated that

Plaintiff could engage in normal activities, as long as they were not "high impact."[3] (R. 346).

In February 2006, Plaintiff visited Dr. Golden regarding fatigue. (R. 388). An examination revealed nothing out of the ordinary. (R. 388). Plaintiff also reported pain in her hips, but x-rays of her hips and pelvis were normal. (R. 386-88).

In March 2006, Plaintiff visited with Dr. Connolly to follow up on her left knee surgery. Plaintiff reported no knee pain at that time, and she indicated to her doctor that she had even been participating in sporting activities. (R. 419). Dr. Connelly observed that her left knee had healed well.

Plaintiff did mention significant right shoulder pain during the March 2006 visit. However, Dr. Connolly noted, "The right shoulder reveals forward elevation of 170 [degrees], external rotation of 45 [degrees], and internal rotation to the L5 level. She has no significant pain with this. She has no deficits in strength . . . . She has good range of motion of the elbow, wrist, and digits. The patient is neurovascularly intact." (R. 419). Nevertheless, Plaintiff elected to undergo an arthroscopy of the right shoulder. Surgery was scheduled for July 2006 (R. 417-18); however, as Defendant points out, there does not appear to be a record of surgery actually being performed.

In July 2006, Judy Prochaska, a licensed social worker, evaluated Plaintiff and determined that she suffered from post traumatic stress syndrome (PTSD). (R.

---

[3] Also in December 2005, a nodule was removed from Plaintiff's thyroid. (R. 229, 395). Medical records do not indicate any complications during or subsequent to the procedure. (R. 395).

404).  Ms. Prochaska recommended individual therapy but did not recommend a psychiatric evaluation.  (R. 404).

Also in July 2006, Plaintiff visited with Dr. Gretchen Cromer after experiencing "gaps in time" and difficulty in "word finding."  (R. 430).  Dr. Cromer referred Plaintiff to Dr. Michael Cullen, a neurologist.  (R. 430).  Plaintiff underwent an EEG on July 17, 2006, and the results revealed an abnormality "due to the presence of bitemporal epileptiform discharges."  (R. 420).  Dr. Cullen stated that the character of the discharges was "somewhat dissuasive," but he noted that "under the appropriate clinical circumstances, this would be supportive of a diagnosis of epilepsy."  (R. 420).  On July 20, 2006, Plaintiff was prescribed Clonazepam, a medication that is used to treat anxiety and which can also be used to treat certain types of seizures.[4]  (R. 446).

In October 2006, Plaintiff saw Dr. Brian Anseeuw.  Plaintiff told Dr. Anseeuw that she had experienced, for four or five years, periods of time loss and difficulty finding words.  Plaintiff stated that this happened on a daily basis.  (R. 425).  The doctor examined Plaintiff and did not find any neurological deficits.

---

[4] Clonazepam is used, in certain cases, to treat epilepsy.  See Epilepsy.com Informational Website: Introduction to Clonazepam, http://www.epilepsy.com/medications/b_clonazepam_intro.  The drug is sometimes used to treat petit mal seizures.  See National Institute of Health MedlinePlus Medical Encyclopedia: Petit mal seizure, http://www.nlm.nih.gov/medlineplus/ency/article/000696.htm; see also Epilepsy Foundation of America Website: Medicine Identification Chart – Klonopin, http://www.epilepsyfoundation.org/answerplace/Medical/treatment/medications/type smedicine/klonopin.cfm.  A petit mal seizure is the term commonly given to a staring spell, most commonly called an "absence seizure." It is a brief (usually less than 15 seconds) disturbance of brain function due to abnormal electrical activity in the brain.  See id.

However, he noted that that his observations were "stereotypical," and he prescribed Lyrica after noting Plaintiff's previous abnormal EEG.[5]  The doctor also indicated that he expected the Lyrica to help with Plaintiff's fibromyalgia.  (R. 426).

In November 2006, Plaintiff met again with Dr. Anseeuw and reported that her problems with time loss and word finding were worsening.  (R. 421).  In his notes, Dr. Anseeuw stated, "There's been no obvious seizure activity."  The doctor also stated that "[Plaintiff] complains that her loss of memory consists of forgetting names, word finding and confusion.  Her MRI was normal."  (R. 421).  Dr. Anseeuw went on to report, "To her current complaints, which may be side effects of the Lyrica[,] I have recommended that we discontinue this slowly over the next two weeks.  I will also obtained [sic] a neuropsychological evaluation.  I cannot find any underlying cause of her current complaints."  (R. 422).

Following a neuropsychological evaluation, in December 2006, Dr. Anseeuw reported that the evaluation revealed no memory problems.  However, Plaintiff still complained of memory problems at that time.  Dr. Anseeuw reported, on December 20, 2006, "[T]here's been no obvious seizures."  (R. 436).  Due to Plaintiff's "unusual circumstances," Dr. Anseeuw ordered a "prolonged seizure monitoring."  (R. 437).

---

[5] Lyrica is a drug used to treat pain caused by nerve damage.  It can be used to treat pain in people with fibromyalgia.  In addition, Lyrica can be used with other medications to treat certain types of seizures.  See WebMD Website: Lyrica Oral, http://www.webmd.com/drugs/drug-93965-Lyrica+Oral.aspx?drugid=93965&drugname=Lyrica+Oral.  With respect to epilepsy, Lyrica is typically used as an "add-on" drug in conjunction with another seizure medication.  See Epilepsy.com Informational Website: How Well Does Lyrica Work?, http://www.epilepsy.com/medications/b_lyrica_work.

In February 2007, Plaintiff underwent a four-day, continuous audio-visual EEG monitoring test at OSF Saint Francis Medical Center.  No abnormalities were observed.  (R. 449-50).  The report detailing the test results stated, "This study is inconclusive due to no clinical events were caught [sic] during the study but the four days normal EEG during wakefulness and sleep make the chance of epileptic seizure lower but we cannot rule out based on this study that patient had epileptic seizure in the past.  Clinical correlation is recommended."  (R. 450).

### Agency Evaluation

In November 2005, Dr. Frank Jimenez, a state agency physician, reviewed Plaintiff's medical records and determined that she was capable of work prior to her September 2005 left knee surgery.  He further indicated that she would again be capable of work within twelve months after the surgery.  (R. 19, 343).  Dr. Jimenez indicated that Plaintiff was capable of lifting ten pounds frequently and twenty pounds occasionally.  He found that Plaintiff was capable of sitting, standing, or walking (with normal breaks) for about six hours in an eight-hour workday.  He also found that she had no limitations in her physical ability to push or pull.  (R. 337).  Dr. Jimenez found that Plaintiff had virtually no postural, manipulative, visual, communicative, or environmental limitations.  (R. 338-40).

### Hearing Testimony

On January 31, 2007, Plaintiff appeared with her attorney and testified at a hearing before the ALJ.  George Paprocki, a vocational expert, also testified at the hearing.  Plaintiff was 48 years of age at the time of the hearing.  She had completed high school and had attended college briefly.  (R. 476-79).  Plaintiff

8

testified that she was performing paid work as a village trustee and as a caretaker for a cemetery. (R. 478, 480). Plaintiff testified that, in the course of her duties at the cemetery, she sells lots for gravesites, marks gravesites for opening, and sometimes mows the cemetery lawn in the summertime. (R. 480). Her duties as a village trustee require her to check paystubs, evaluate time sheets, make phone calls, and attend meetings. (R. 479).

Plaintiff testified that she was previously employed, for twenty-two years, as an assistant at a mobile medical station. This job required her to drive to businesses in various locations and perform physicals, blood tests, and other medical tests on employees. (R. 482, 485). She was also responsible for the upkeep of the mobile station, which was labor-intensive work. (R. 485, 496-97). In addition, Plaintiff previously worked at a convenience store and a gas station. It is unclear from the transcript as to precisely when she held these various jobs.

Plaintiff testified that she quit her job at the medical station after she was diagnosed with fibromyalgia and after she began experiencing problems with her left eye and left leg. (R. 485). Plaintiff stated that, due to her ailments, she was unable to climb into the vehicle – a three or four foot climb. Plaintiff testified to having ongoing problems with her left knee. (R. 487). She also testified to having pain in her neck and back; she stated that she could not sit up straight or perform very much lifting. (R. 487-88). Plaintiff testified that she takes Tramadol regularly for her pain. (R. 489).

Plaintiff also testified to taking Clonazepam and Lamictal for seizures. (R. 489-90). Plaintiff characterized her seizure condition as follows: "I'm kind of like.

I'm cloudy. I stop and I have to think about what I have to say and sometimes I'd lose track of what I'm saying and I jump to another subject." (R. 490). She testified that she experiences staring spells, in which she "blanks out" but does not completely lose consciousness. (R. 498). When questioned as to the frequency of these staring spells, Plaintiff did not seem to know, exactly. She guessed that the spells occurred daily. (R. 498). According to Plaintiff's testimony, her husband had previously told her that these staring spells lasted about ten to fifteen seconds. (R. 498).

In one portion of her testimony, Plaintiff seemed to suggest that she has suffered from mental "cloudiness" throughout her life. When asked about the first onset of her seizures, Plaintiff responded, "I guess I probably had them a long time, I just had never noticed them as much. Everybody else around me noticed it. It affected my speech all my life. I've never been able to talk very well." (R. 490). In the same portion of testimony relating to her seizures, Plaintiff went on to say, "I just . . . grew up with it, my mother just, she would tell the teachers there's nothing wrong with this kid, you teach her, you know . . . . So I w[e]nt to school and then I learned like everybody else, but I had a hard time." (R. 491).

Plaintiff testified that she does not do too much work around the house, but she also testified that her daily routine involves cleaning up her house and doing laundry. (R. 492-93). She travels weekly with her husband to the cemetery where she works to make sure it looks nice, and she also travels with her husband to the post office and to the grocery store. (R. 495). Plaintiff testified that she cannot read very well because of a lazy eye and headaches. According to her testimony, she

must rest after reading one paragraph and has never been able to finish a book all the way through.  (R. 492).  Plaintiff testified that she has trouble functioning if she does not take Tramadol regularly to control her pain.  She indicated that she lies down four or five times a day for a total of about one or two hours.  (R. 499).

Mr. Paprocki, a vocational expert, also testified at the hearing.  He testified that he was specifically familiar with the job market in Iowa, including the Illinois quad city area.  (R. 499-500).  Noting that Plaintiff was confined to light work, Mr. Paprocki testified that Plaintiff would not be capable of performing her previous job on the mobile medical station because that job involved heavy physical exertion at times.  (R. 500-01).  However, Mr. Paprocki also indicated that Plaintiff's past position at the mobile medical station fit into the larger category of jobs labeled as "medical assistant" positions.  (R. 500-02).  Mr. Paprocki testified that medical assistant positions, as those positions generally exist in the national economy, involve only a low level of physical exertion.  Mr. Paprocki went on to testify that Plaintiff's physical and vocational profile would qualify her to work as a medical assistant in a low-exertional or light-work setting.

After discussing the skills that Plaintiff acquired in her previous job as a medical station assistant, Mr. Paprocki testified that these skills were transferable to various other positions in the medical field.  Specifically, Mr. Paprocki testified that Plaintiff would be able to work as an EKG technician, radiologic technologist, or medical records clerk.  He pointed to a significant number of these jobs available in the regional and national economies.  (R. 500-03).

11

Plaintiff's attorney elicited additional testimony to rebut Mr. Paprocki's testimony. Plaintiff testified that she was not licensed to do any type of medical test other than chest x-rays. (R. 503). Further, Mr. Paprocki testified that he was unable to give a breakout of the specific number of medical assistant jobs available at full-time status. (R. 504). Mr. Paprocki estimated, based on his experience, that ninety percent of the jobs to which he referred were full-time. But he admitted that he did not have further documentation on hand to substantiate his estimate. (R. 505-06).

Mr. Paprocki also testified that if Plaintiff were required to rest up to an hour, in addition to normal breaks, she would not be competitive for full-time employment. (R. 504). In addition, Mr. Paprocki seemed to indicate that if Plaintiff suffered from twenty-second staring spells, twice per day, this would reduce her qualification for jobs that involve regular public interaction. However, according to Mr. Paprocki , this "staring spell hypothetical" would not reduce Plaintiff's qualification for the position of medical records clerk because that position does not involve regular face-time with the public (R. 504-05).

At the hearing, the ALJ agreed to keep the record open so as to incorporate the results from Plaintiff's February 2007 EEG. (R. 474).

## DISCUSSION

### Legal Standards

To be entitled to disability benefits under the Social Security Act, a claimant must prove that she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. §

12

423(d)(1)(A).  To determine if the claimant is unable to engage in any substantial gainful activity, the Commissioner of Social Security engages in a factual determination.  See  McNeil v. Califano, 614 F.2d 142, 143 (7th Cir. 1980).  That factual determination is made by using a five-step sequential analysis.  20 C.F.R. § 404.1520; see Maggard v. Apfel, 167 F.3d 376, 379-80 (7th Cir. 1999).

In the first step, a threshold determination is made to decide whether the claimant is presently involved in a substantially gainful activity.  20 C.F.R. § 404.1520(b).  If the claimant is not under such employment, the Commissioner of Social Security proceeds to the next step.  Under the second step, the Commissioner evaluates the severity and duration of the impairment. 20 C.F.R. § 404.1520(c).  If the claimant has an impairment that significantly limits her physical or mental ability to do basic work activities, the Commissioner will proceed to the next step. Under the third step, the Commissioner compares the claimant's impairments to a list of impairments considered severe enough to preclude any gainful work; and, if the elements on the list are met or equaled, he declares the claimant eligible for benefits.  20 C.F.R. § 404.1520(d).  If the claimant does not qualify under one of the listed impairments, the Commissioner proceeds to the fourth and fifth steps.

In the fourth step, the claimant's Residual Functional Capacity (RFC) is evaluated to determine whether the claimant can pursue her past work.  20 C.F.R. § 404.1520(f).  If she cannot, then the Commissioner evaluates the claimant's ability to perform other work available in the economy.  20 C.F.R. § 404.1520(g).

The claimant has the burdens of production and persuasion in steps one through four.  However, once the claimant shows an inability to perform her past

13

work, the burden shifts to the Commissioner to show an ability to engage in some other type of substantial gainful employment.  See Tom v. Heckler, 779 F.2d 1250, 1253 (7th Cir. 1985); see also Halvorsen v. Heckler, 743 F.2d 1221, 1225 (7th Cir. 1984).

Once a case reaches a federal district court, the court's review is governed by 42 U.S.C. 405(g) which provides, "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." Maggard, 167 F.3d at 379 (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).

A court's function on review is not to try the case de novo or to supplant the ALJ's finding with the Court's own assessment of the evidence.  See Pugh v. Bowen, 870 F.2d 1271, 1274 (7th Cir. 1989).  A court must only determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied.  See Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986). Furthermore, in determining whether the ALJ's findings are supported by substantial evidence, credibility determinations made by the ALJ will not be disturbed unless clearly erroneous.  See Imani v. Heckler, 797 F.2d 508, 510 (7th Cir. 1986), cert. denied, 479 U.S. 988 (1986).

However, the ALJ must articulate reasons for rejecting or accepting entire lines of evidence.  Godbey v. Apfel, 238 F.3d 803, 807-08 (7th Cir. 2000).  The ALJ is required to "sufficiently articulate his assessment of the evidence to 'assure us that [he] considered the important evidence . . . [and to enable] us to trace the path of

14

[his] reasoning.'" Carlson v. Shalala, 999 F.2d 180, 181 (7th Cir. 1993) (quoting

Stephens v. Heckler, 766 F.2d 284, 287 (7th Cir. 1985)).

## ALJ's Decision

On June 18, 2007, the ALJ issued an unfavorable decision regarding

Plaintiff's disability claim.  He found that the only impairments which qualified as

"severe" were Plaintiff's degenerative joint disease, left knee impairment, and

seizure disorder.  (R. 13).  The ALJ found that Plaintiff's allegations of fibromyalgia

were "not supported by positive trigger point findings."  (R. 13).  He also found that

the loose bone matter in Plaintiff's right shoulder did not constitute a severe

impairment because the evidence showed "only minimally positive adduction

impingement signs" and because no evidence of right shoulder surgery was on

record.  (R. 13).

Of Plaintiff's impairments that were found to be severe, none met or equaled

the requirements for a listed impairment, according to the ALJ.  He noted that

Plaintiff's back condition did not satisfy Listing Section 1.04 because Plaintiff did

not experience nerve root compression, spinal arachnoiditis, or spinal stenosis.  The

ALJ found that Plaintiff's musculoskeletal impairments did not prevent her from

ambulating or performing fine and gross movements effectively.  The ALJ also

found that Plaintiff's seizure disorder did not satisfy Listing Sections 11.02 or 11.03

because the record did not establish that she experiences seizures with the

frequency or severity that those listings require.  (R. 13).

The ALJ went on to determine Plaintiff's RFC.  He noted that Plaintiff

reported multiple joint pains, as well as pain in her left leg, right shoulder, arms,

and hands.  The ALJ noted x-rays showing mild disc herniation in Plaintiff's cervical spine as well as "mild rotary scoliosis," but he determined that these impairments did not warrant a finding of complete disability.  The ALJ also found that the evidence on record did not establish disabling joint pain.  Pointing to Plaintiff's successful September 2005 left knee replacement and also to subsequent medical records indicating Plaintiff's participation in sports, the ALJ concluded that the record did not show the extreme loss of motion associated with a finding of disability.  (R. 13-14).  As to the seizure disorder, the ALJ concluded that Plaintiff suffers minor episodes but no major episodes.  (R. 14).

The ALJ indicated that he did not find Plaintiff's claims of disabling pain to be completely credible.  He found that the "usual objective signs of severe pain . . . [were] not indicated in the record, such as abnormal weight loss or muscle atrophy." (R. 14).  He noted that Plaintiff takes Tramadol regularly for pain, but he also noted that she does not take "strong codeine or morphine-based analgesics" of the sort that are usually prescribed for "severe and unremitting pain."  (R. 14).  The ALJ further noted that the consistency of Plaintiff's use of Tramadol seemed to indicate that the drug substantially relieves her symptoms.  The ALJ pointed to Plaintiff's testimony about her daily activities as additional evidence that she is able to perform light work activity.  (R. 14).

After determining that Plaintiff's joint pain limits her to light work parameters, the ALJ deemed Plaintiff able to perform her past work as a medical assistant, "as that job is generally performed at the light level of exertion."  (R. 15). Relying on the testimony of the vocational expert, Mr. Paprocki, the ALJ found, in

the alternative, that a significant number of other jobs exist in the regional and national economies to which Plaintiff's skills could be successfully applied. Specifically, the ALJ found Plaintiff to be qualified to perform light work in the following positions: EKG technician; radiologic technician; and medical records technician.  (R. 15).  Ultimately, the ALJ concluded that Plaintiff was not under a disability for purposes of the Social Security Act.  (R. 16).

## Analysis

Plaintiff makes the following arguments: (1) the ALJ erred in failing to provide sufficient analysis for his finding that Plaintiff's seizure condition does not meet or equal a listed impairment; (2) the ALJ erred in ignoring Plaintiff's fibromyalgia, right shoulder impairment, and her several recent surgeries; (3) the ALJ erred in his credibility determination regarding Plaintiff's allegations of disabling pain; (4) the ALJ erred in concluding that Plaintiff is able to pursue her past work or other available work.

1.   ALJ's Finding regarding Plaintiff's Seizure Condition

In addressing Plaintiff's alleged seizure condition, the ALJ determined that "[h]er seizure disorder does not satisfy sections 11.02 or 11.03, as the record does not establish seizures with the required severity or frequency."  (R. 13).  Plaintiff argues that the ALJ failed to provide sufficient analysis as to why her seizure condition does not meet the requirements of Listing Sections 11.02 or 11.03.  (Ptf.'s Br. at p. 10).  Specifically, Plaintiff argues that the ALJ did not make clear determinations as to the frequency or severity of her seizures.  She cites Boiles v.

Barnhart, 395 F.3d 421, 426 (7th Cir. 2005) for the proposition that the ALJ was required to make these determinations.

Plaintiff misreads Boiles and confuses the distinction between an ALJ's duty to develop a full and fair record and a claimant's burden of proof. The ALJ in Boiles found that the claimant's seizure disorder did not meet the requirements of Listing Section 11.02 because the frequency of the claimant's seizures was "open to question." 395 F.3d at 426. In rejecting the ALJ's finding, the Court of Appeals concluded that the ALJ erred by improperly discrediting a treating physician's opinion that the claimant had two pseudoseizures per week.

The present case is distinguishable from Boiles because the record, here, does not reflect that a treating physician opined as to the frequency of Plaintiff's staring spell episodes. Plaintiff points to a few specific medical records, identifying them as "medical documentation" that her seizures occur daily. However, these records merely document what Plaintiff told Dr. Anseeuw during one or more visits with him. (R. 425, 443).[6]

---

[6] Plaintiff cites Barnett v. Barnhart, 381 F.3d 664 (7th Cir. 2004), but that case is also distinguishable and not directly on point. The Court of Appeals in Barnett held that the ALJ had improperly disregarded a treating physician's opinion because he saw it as "inconsistent with the medical record." 381 F.3d at 669. The Court of Appeals noted that "if the ALJ's real concern was the lack of backup support for Dr. Plascak's opinion, the ALJ had a mechanism to rectify the problem. An ALJ has a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernable." Id. Unlike in Barnett, the ALJ in this case did not encounter a situation in which he found a treating physician's opinion – as to the frequency or severity of Plaintiff's seizures – to be unsupported by the record. Therefore, there was no need for the ALJ to solicit additional evidence on the subject.

Plaintiff points to a specific phrase in <u>Boiles</u>, which provides as follows: "At the very least, the ALJ was obligated to solicit more evidence if he believed that the frequency of the seizures, as reflected in the record, was unclear." <u>Id.</u> (citing <u>Smith v. Apfel</u>, 231 F.3d 433, 437-38 (7th Cir. 2000)).  The <u>Smith</u> case, to which the Court of Appeals cited in <u>Boiles</u>, supports the proposition that an ALJ has an obligation to develop a full and fair record.  In that case, the Court of Appeals held that the ALJ erred in failing to order an x-ray of the claimant's knee.  The Court of Appeals held that an updated x-ray was necessary because the last x-ray of the knee was taken nearly ten years before the claimant's disability hearing, and it showed preliminary degenerative disease.  231 F.3d at 437-38.  The <u>Smith</u> Court stated that "[a]lthough a claimant has the burden to prove disability, the ALJ has a duty to develop a full and fair record."  <u>Id.</u> at 437.

An ALJ may, under certain circumstances, be obligated to solicit relevant evidence as to a claimant's impairment for purposes of developing the record.  However, the Court of Appeals in <u>Boiles</u> did not hold that an ALJ must precisely establish the frequency of a claimant's seizures in all cases where seizures are alleged.  The burden at Step 3 of the analysis rests squarely on the claimant.  <u>See</u> 20 C.F.R. § 404.1512(a) – (c); <u>Eichstadt v. Astrue</u>, 534 F.3d 663, 668 (7th Cir. 2008) ("The claimant bears the burden of producing medical evidence that supports her claims of disability.  That means that the claimant bears the risk of uncertainty . . . ."); <u>see also</u> <u>Scheck v. Barnhart</u>, 357 F.3d 697, 702 (7th Cir. 2004) ("It is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove [a] claim of disability.").

There is a certain tension between the claimant's burden of proof and the ALJ's duty to develop the record. "While it is true that the ALJ has a duty to make a complete record, this requirement can reasonably require only so much." Scheck, 357 F.3d at 702. An unreasonable expansion of the ALJ's duty to develop the record would be a "formula for paralysis." Id. (citing Kendrick v. Shalala, 998 F.2d 455, 456 (7th Cir. 1993)).

In the present case, the ALJ did enough to develop the record with regard to the severity and frequency of Plaintiff's staring spells. Specifically, he agreed to leave the record open after the January 31, 2007 hearing so as to incorporate the results of Plaintiff's February 2007 four-day, continuous EEG. (R. 474). As noted by the ALJ in his decision, the results of the EEG did not indicate any abnormality; no seizures were detected. (R. 14, 449-50). If Plaintiff did have seizures that occur daily – as she alleges – some evidence of these seizures would likely have been observed during that 2007 EEG.

The ALJ considered the record as a whole and found that the evidence did not establish that Plaintiff suffers from a seizure condition that satisfies Listing Sections 11.02 or 11.03. The ALJ noted that Plaintiff's most recent EEG on record was normal. He also noted that an earlier abnormal EEG yielded results that were "somewhat dissuasive" of epilepsy, according to Plaintiff's treating physician.[7] (R.

---

[7] Plaintiff alleges that the ALJ misconstrued the 2007 EEG results by stating that they were "normal." This is a weak argument, as the 2007 EEG results unequivocally show that no seizure activity was observed over a four-day period. (R. 449-50). Further, in the medical record reflecting the abnormal July 2006 EEG results, Dr. Cullen equivocated as to whether the results supported an epilepsy diagnosis. The doctor stated that the results were "somewhat dissuasive." (R. 420).

14).  Although the ALJ made these references in evaluating Plaintiff's RFC at Step 4, the Court finds that the ALJ sufficiently articulated his Step 3 reasoning by generally indicating his consideration of the two sets of EEG results.  There is no requirement that an ALJ's decision be structured perfectly.

Any failure by the ALJ to more precisely articulate his reasoning in applying Listing Sections 11.02 and 11.03 was harmless error because nothing in the record would support a finding that Plaintiff's seizures have been "documented by [a] detailed description of a typical seizure pattern, including all associated phenomena."  20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 11.02-11.03; See Keys v. Barnhart, 347 F.3d 990, 994-95 (7th Cir. 2003) (applying harmless error doctrine to Social Security disability decision); see also Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.").  The results of Plaintiff's 2006 EEG are insufficient to satisfy this requirement.  The Court will defer to the ALJ's conclusion that Plaintiff did not meet her burden at Step 3.

---

Plaintiff's broad argument that the ALJ has misconstrued the evidence in this case is unpersuasive.  Contrary to Plaintiff's interpretation, this case is not similar to Steele v. Barnhart, 290 F.3d 936, 940 (7th Cir. 2002), in which the Court of Appeals held that the ALJ blatantly mischaracterized as "unremarkable" EEG results indicating significant abnormalities.

2.      Plaintiff's Fibromyalgia, Right Shoulder Impairment, and her Several
        Surgeries

Plaintiff argues that the ALJ erred in failing to even mention her

fibromyalgia, right shoulder impairment, or her recent surgeries.  (Ptf.'s Br. at p.

13-14).  Plaintiff's reference to her "several surgeries" is ambiguous; she is probably

referring to her knee replacement, hysterectomy, and thyroid nodule removal,

which all occurred between 2004 and 2005.[8]  She cites to various decisions for the

proposition that it is error for an ALJ to fail to mention rejected evidence.  See, e.g.,

Zblewski v. Schweiker, 732 F.2d 75, 79 (7th Cir. 1984).

Plaintiff's argument is, for the most part, inaccurate.  In his decision, the ALJ

did mention Plaintiff's allegations of fibromyalgia, as well as the evidence of loose

bone matter in her right shoulder.  (R. 13).  The ALJ also specifically mentioned

Plaintiff's total left knee replacement.  (R. 14).  Further, he noted medical records

which indicated that Plaintiff's left knee had healed well and had improved to the

point that she was engaging in sports.  (R. 14).

The ALJ's failure to mention Plaintiff's hysterectomy and thyroid surgery is

excusable because the evidence on record indicates that Plaintiff healed well from

these surgeries and that she did not experience serious complications.  (R. 186, 191-

92, 196, 395).  An ALJ is not required to address every piece of evidence in his

decision.  See Sims v. Barnhart, 309 F.3d 424, 429 (7th Cir. 2002); see also

Zblewski, 732 F.2d at 79 ("We emphasize that we do not require a written

evaluation of every piece of testimony and evidence submitted.").  Plaintiff makes no

_____

[8] It is ironic that Plaintiff faults the ALJ for failing to mention her specific surgeries
when, in her own brief, she fails to specify the surgeries to which she is referring.

serious attempt to argue that her hysterectomy and thyroid surgery resulted in impairments which would impact her ability to work.

As to Plaintiff's shoulder impairment, the ALJ determined that this was not a severe impairment because evidence showed "only minimally positive adduction impingement signs." This finding is consistent with Dr. Connolly's March 29, 2006 examination of Plaintiff's right shoulder (R. 419) and is, therefore, supported by substantial evidence.

Plaintiff makes much of the ALJ's disregard for her fibromyalgia diagnosis. In his decision, the ALJ stated that Plaintiff's allegations of fibromyalgia were "not supported by positive trigger point findings." (R. 13). Dr. Golden diagnosed Plaintiff with fibromyalgia in August 2003. (R. 220). The opinion of a treating physician concerning a patient's condition is entitled to controlling weight if it is well-supported by medical findings and not inconsistent with other substantial evidence on the record. <u>Boiles</u>, 395 F.3d at 426.

Fibromyalgia is a "common, but elusive and mysterious, disease." <u>Sarchet v. Chater</u>, 78 F.3d 305, 306 (7th Cir. 1996) (citing medical publications). Symptoms of fibromyalgia, which can elude objective verification, include "pain all over," fatigue, and stiffness. <u>Id.</u> There is no laboratory test to determine the presence or severity of the disease. <u>Id.</u> The only symptom that separates fibromyalgia from other rheumatic diseases is that of "multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause

the patient to flinch." Id.  Most cases of fibromyalgia do not cause a patient to be unable to work.  Id. at 307.

The medical record that reflects Dr. Golden's diagnosis of fibromyalgia in August 2003 does not indicate that the doctor observed eleven or more trigger points on Plaintiff's body.  In fact, it seems as though Dr. Golden settled on the diagnosis of fibromyalgia because he did not know exactly what was wrong with Plaintiff.  (R. 220).  Dr. Golden reaffirmed his diagnosis in October 2004 after his examination revealed trigger points on Plaintiff's back.  (R. 214).  However, as Defendant points out, there are less than eleven fibromyalgia trigger points on the back.[9]  Therefore, so far as the Court can tell, Dr. Golden's diagnosis of fibromyalgia is not well-supported by medical findings.

Even so, the ALJ did err in conclusively disregarding Dr. Golden's diagnosis. Given evidence in the record which details Plaintiff's complaints of chronic pain, the ALJ should have solicited more medical evidence to flesh out the doctor's opinion. See Barnett v. Barnhart, 381 F.3d 664, 669 (7th Cir. 2004).  It is possible that supplemental information from Dr. Golden or another physician could have confirmed the necessary number of fibromyalgia trigger points on Plaintiff's body.

The error, however, is harmless and does not warrant a remand.  See Fisher, 869 F.2d at 1057.  Even if Plaintiff does suffer from fibromyalgia, most instances of the disease do not involve the type of pain that is totally disabling.  Sarchet, 78 F.3d

---

[9] See Frederick Wolfe et al., The American College of Rheumatology 1990 Criteria for the Classification of Fibromyalgia: Report of the Multicenter Criteria Committee, 33 Arthritis & Rheumatism 160 (1990), summary available at <http://www.rheumatology.org/publications/classification/fibromyalgia/fibro.asp?aud=mem>.

at 307.  As is discussed below, the Court will defer to the ALJ's finding that Plaintiff does not experience pain of such severity that it renders her unable to work.

3.   <u>ALJ's Credibility Determination regarding Plaintiff's Claims of Disabling Pain</u>

An ALJ is guided by Social Security Ruling (SSR) 96-7p in making credibility determinations regarding a claimant's allegations of pain.  This Court must give heavy deference to the credibility determinations of the ALJ and must preserve them unless they are "patently wrong."  <u>Diaz v. Chater</u>, 55 F.3d 300, 308 (7th Cir. 1995).  The ALJ found that Plaintiff's allegations of disabling pain were not fully credible because she has not exhibited the physical signs usually associated with extreme and unremitting pain.  (R. 14).  The ALJ also found that Plaintiff's pain is not extreme because Tramadol relieves her symptoms to the point where she can participate in daily activities, such as the following: working as a part-time caretaker for a cemetery; doing housework; and spending time on her computer.  (R. 14-15).  The ALJ noted that Plaintiff's pain is not of such severity that it requires her to take strong codeine or morphine-based analgesics.  (R. 14).  The ALJ mentioned Plaintiff's allegations that she could not dress or get out of bed independently, but he concluded that these allegations were not consistent with the remainder of the record.  (R. 15).

The ALJ made his credibility determination by applying SSR 96-7p, and he supported the determination by discussing substantial relevant evidence.  (R. 14, 476-77, 480, 489, 492-496).  The determination is, therefore, not patently wrong. The Court will not disturb it.

25

4.    <u>Plaintiff's Ability to Pursue Past Work or Other Work</u>

The ALJ found that Plaintiff "could return to past work as a medical assistant, as that job is generally performed at the light level of exertion (the claimant says she did the work at the heavy level of exertion)" (R. 15).[10]  In finding that a claimant is able to return to her past work, "the ALJ must specify the duties involved in a prior job and assess the claimant's ability to perform the specific tasks." <u>Nolen v. Sullivan</u>, 939 F.2d 516, 519 (7th Cir. 1991).  A failure to meet this requirement may warrant a remand.  <u>Id.</u>[11]

Here, the ALJ fell short of the <u>Nolen</u> standard in recording his Step 4 finding. It appears, from Mr. Paprocki's testimony, that the "medical assistant" position, as defined under the Dictionary of Occupational Titles, is an umbrella category which incorporates various types of medical jobs.  (R. 500-01).  Depending on the setting, a medical assistant may operate x-ray equipment, give EKGs, administer vision testing, etc.  The ALJ's Step 4 finding was insufficient because it is unclear from his written decision which specific type of job within the "medical assistant" category that Plaintiff was deemed to be capable of performing.  Further, the ALJ did not

---

[10] The ALJ's finding appears to be an application of SSR 82-61, which states that "a claimant will be found to be 'not disabled' when it is determined that he or she retains the RFC to perform: (1) [t]he actual functional demands and job duties of a particular past relevant job; or (2) [t]he functional demands and job duties of the occupation as generally required by employers throughout the national economy."

[11] A recent unpublished decision by our Court of Appeals has suggested that <u>Nolen</u> should be construed narrowly in light of <u>Smith v. Barnhart</u>, 388 F.3d 251 (7th Cir. 2004) (discussing the relationship between the "<u>Nolen</u> rule" and SSR 82-61).  <u>See</u> <u>Cohen v. Astrue</u>, 258 Fed. Appx. 20, 28 (7th Cir. 2007).  <u>Nolen</u>, however, is still good law, and at least one district court in our Circuit has recently adhered to it.  <u>See</u> <u>Kenefick v. Astrue</u>, 535 F. Supp.2d 898, 909 (N.D. Ill. 2008).

make an explicit comparison of the duties of a specific "medical assistant" position and Plaintiff's current physical capabilities.  Nolen requires this type of detailed comparison at Step 4, and this Court is bound by that decision.  Accordingly, the ALJ erred at Step 4.

The ALJ, however, made an alternative Step 5 finding that Plaintiff is able to engage in some other type of gainful employment.  At Step 5, the ALJ stated, "There is evidence of transferable skills to work existing within the residual functional capacity." (R. 15).  Relying on the vocational expert's testimony, the ALJ found that Plaintiff could work as an E[K]G technician (430 local and 45,000 national positions), a radiologic technician (2,100 local and 179,000 national positions), or a medical records technician (1,000 local and 80,000 national positions).  (R. 15).

Plaintiff argues that the ALJ erred at Step 5 by failing to specifically identify her skills that were deemed to be transferable to the stated jobs, as is required under SSR 82-41.[12]   Indeed, SSR 82-41 is applicable, and the ALJ did not detail Plaintiff's transferable skills.  SSR 82-41 provides, in part, "When the issue of skills and their transferability must be decided, the adjudicator or ALJ is required to make certain findings of fact and include them in the written decision . . . . When a finding is made that a claimant has transferable skills, the acquired work skills must be identified, and specific occupations to which the acquired work skills are transferable must be cited in the . . . ALJ's decision."  SSR 82-41(6).

---

[12] In the brief regarding summary affirmance, Defendant fails to directly address Plaintiff's argument.

It is important to note that SSR 82-41, standing alone, does not have the force of law.  See Ukolov v. Barnhart, 420 F.3d 1002, 1005 n.2 (9th Cir. 2005). Plaintiff failed to cite any decision to support her SSR 82-41 argument.  In its own research, the Court located Key v. Sullivan, 925 F.2d 1056, 1062-63 (7th Cir. 1991). In Key, the Court of Appeals discussed "SSR 1982," which appears to be a previous identifier for SSR 82-41.  The Court of Appeals, in Key, noted that the ALJ failed to comply with SSR 1982 by not identifying transferable work skills in his written Step 5 finding.  Ultimately, the Court of Appeals remanded the action.  However, the decision to remand in Key was not based on the mere failure of the ALJ to comply with SSR 1982; rather, the Court of Appeals was troubled by the lack of evidence underpinning the ALJ's finding that the claimant possessed transferable job skills.  In making the transferability finding, the ALJ relied primarily on the testimony of a vocational expert.  While the vocational expert gave general testimony about the claimant's past jobs, the expert did not testify as to the transferability of skills that the claimant had acquired in those jobs.  925 F.2d at 1063.

The present case is distinguishable from Key because, here, the record indicates that Mr. Paprocki, the vocational expert, analyzed the specific skills Plaintiff acquired in her past job as a mobile medical station employee.  (R. 500). Mr. Paprocki gave testimony about the transferability of those skills to other jobs that are available in the regional economy.  (R. 500-03).  In his decision, the ALJ indicated his reliance on Mr. Paprocki's testimony regarding transferable job skills and corresponding available jobs.  (R. 15).  Therefore, the concerns that the Court of

Appeals expressed in <u>Key</u> are not at play in this case.  This Court does not interpret <u>Key</u> to mandate a remand in every case where an ALJ fails to list, in specific detail at Step 5, the claimant's transferable skills acquired in previous employment.

A recent line of cases outside our Circuit has construed SSR 82-41 narrowly. The Sixth Circuit Court of Appeals has held that SSR 82-41 does not require an ALJ to list, in detail, a claimant's transferable jobs skills unless the ALJ relies solely on the medical-vocational grid to make his Step 5 determination.[13]  <u>See</u> <u>Wilson v. Comm'r of Social Security</u>, 378 F.3d 541, 549-50 (6th Cir. 2004).  Other federal courts outside the Sixth Circuit have adopted this interpretation.  <u>See, e.g.</u>, <u>Saucedo v. Astrue</u>, 2008 WL 4238908, at *12 (N.D. Tex. Sept. 16, 2008); Lopez v. Barnhart, 2006 WL 1272644, at *7 (D. Conn. Mar. 1, 2006).  The Sixth Circuit's interpretation is reasonable because, when the ALJ uses the grid in lieu of a vocational expert's documented opinion to make a Step 5 determination, it makes sense to require greater transparency in the ALJ's reasoning.  The same exacting transparency seems unnecessary when a reviewing court can easily refer to a transcript of the vocational expert's testimony to determine whether the expert performed an adequate analysis of job skill transferability.

This Court is convinced that it is appropriate to apply the Sixth Circuit's narrow interpretation of SSR 82-41 here, as it is clear that the ALJ relied on testimony from a vocational expert who specifically analyzed the claimant's transferable skills.  Even if the ALJ did err by not listing Plaintiff's transferable skills in his decision, this Court would not be inclined to remand the case because

---

[13] The grid is located at 20 C.F.R. Pt. 404, Subpt. P, App. 2.

the record does not reasonably support the possibility of a different result at Step 5. See Fisher, 869 F.2d at 1057.

Plaintiff's allegations about headaches and her need for frequent, long breaks are not adequately established in the medical record. Even Plaintiff's own testimony about these alleged deficits is insufficient to prove that her headaches significantly impact her ability to work or that she absolutely needs to take long, extended breaks each day. The ALJ was not required to substantively incorporate these alleged deficits when calculating Plaintiff's RFC. See Sims, 309 F.3d at 429.

Finally, Plaintiff's argument that her seizure condition prohibits her from gainful employment has no support in the evidence. In fact, when asked at the hearing about the onset of her seizure condition, Plaintiff suggested that the condition had affected her even as a child. In spite of this, she was able to hold a job as a mobile medical station employee for over twenty years. Nonetheless, the ALJ gave Plaintiff the benefit of the doubt by expressly considering her seizure condition in calculating the RFC. (R. 14).

The ALJ's determination that Plaintiff is not disabled is supported by substantial evidence. The ALJ used the correct legal standards in arriving at his decision. Any minor errors that the ALJ may have committed in writing his decision were harmless, as there would be no basis for a finding of disability on remand.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment is DENIED, and Defendant's Motion for Summary Affirmance is GRANTED.

ENTERED this <u>26th</u> day of January, 2009.

s/ Joe B. McDade
_____
JOE BILLY McDADE
United States District Judge
